IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Delores Butler Haynes, ) | |
| ) | Civil Action No. 6:13-2090-MGL-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Carolyn W. Colvin, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits ("DIB") on December 18, 2009, alleging that she became unable to work on June 4, 2009. The application was denied initially and on reconsideration by the Social Security Administration. On March 23, 2011, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Arthur F. Schmidt, an impartial vocational expert appeared on January 19, 2012, considered the case *de novo* and, on January 27, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on June 3, 2013. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)  The claimant meets the insured status requirements of the Social Security Act on December 31, 2013.
>
> (2)  The claimant has not engaged in substantial gainful activity since June 4, 2009, the alleged onset date (20 C.F.R. § 404.1571 *et seq.*).
>
> (3)  The claimant has the following severe impairments: right rotator cuff tear/tendonitis, status post cervical anterior cervical diskectomy and fusion (ACDF), and a thoracic deformity (20 C.F.R. § 404.1520(c)).
>
> (4)  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).
>
> (5)  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 C.F.R. § 404.1567(b). Specifically, she is able to lift and carry up to 10 pounds occasionally and 10 pounds frequently, stand and/or walk for about 6 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday, except she can never climb ladders, ropes or scaffolds. Further, the claimant is limited to occasionally kneeling, crouching, crawling, climbing ramps and stairs, reaching overhead bilaterally, and pushing or pulling with the dominant right upper extremity.
>
> (6)  The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).
>
> (7)  The claimant was born on February 8, 1960, and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 C.F.R. § 404.1563).

>   (8)  The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).
>
>   (9)  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).
>
>   (10)  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that existed in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569 and 404.1569(a)).
>
>   (11)  The claimant has not been under a disability, as defined in the Social Security Act, from June 4, 2009, through the date of this decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged

in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988)

(citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

An MRI of the plaintiff's brain was taken on February 16, 2009, due to complaints of headaches.  The images were significant for possible microangiopathy (small blood vessel disease) and a possible microadenoma (tumor) on the pituitary gland (Tr. 248).

A cervical spine x-ray, taken on March 9, 2009, due to complaints of neck pain, showed mild intervertebral disc space narrowing and spondylosis at C4-5 and mild spondylitic encroachment on the C4-5 neural foramen on the right (Tr. 247).

An MRI of the plaintiff's right shoulder was taken on April 16, 2009, due to complaints of shoulder pain (Tr. 223). The MRI revealed mild rotator cuff tendinopathy with a very shallow partial tear/fraying of the articular surface distal central portion.  There was minimal nonspecific fluid within the subacromial subdeltoid bursa and within the joint space. The plaintiff was assessed with a mildly osteoarthritic acromioclavicular joint.  An MRI of the cervical spine taken on the same date showed high grade central stenosis at C3-4 and

moderate central stenosis C4-5 secondary to disc herniation and disc bulge respectively (Tr. 244).

On April 30, 2009, the plaintiff told Don O. Stovall, Jr., M.D., at Low Country Orthopedics and Sports Medicine that she had been experiencing neck and shoulder pain for two to three months (Tr. 326). She felt that the pain radiated into her right shoulder and the proximal portion of the right upper arm. She complained of numbness and tingling in the fingers of the right hand. Her pain was aggravated by moving her neck, especially at the beginning and end of the day. She had tried medications and physical therapy. On exam, Dr. Stovall noted tenderness in the right paraspinal muscles in the cervical spine and across the trapezius. She had some limited extension and pain on right rotation. Her right arm had no tenderness and full range of motion with no pain or crepitation. Joint stability was adequate. Muscle strength and tone were normal. Dr. Stovall noted the findings of the recent cervical MRI. He observed some cervical kyphosis across the C3-4 and C4-5 disc spaces and broad based central disc herniations at C3-4 and bulging at C4-5 that caused some impression on the thecal sac and impingement of the cord. There was higher grade stenosis at C3-4. Dr. Stovall's assessment was cervical stenosis at C3 through C5, cervical spinal stenosis, and right arm radiculopathy with some myelopathic findings. Dr. Stovall recommended conservative treatment and an epidural injection. He noted that surgical intervention might be needed if this course did not provide relief (Tr. 326).

On July 8, 2009, the plaintiff had a chest x-ray for assessment prior to a hysterectomy and removal of her ovaries (Tr. 242). The x-ray was normal aside from an enlarged cardiac silhouette and thoracic aortic ectasia (dilation), both consistent with a history of hypertension.

The plaintiff was seen at Berkeley Medical Center on October 2, 2009, with a headache (Tr. 283). She reported that she had been substitute teaching at Cross

6

Elementary School. Her blood pressure was elevated at 166/100 and 167/118, and she was instructed not to work for one week.

On October 7, 2009, the plaintiff returned to Dr. Stovall. She reported her epidural injection in May had provided relief for less than a month (Tr. 324). She currently had moderate aching pain in her cervical spine that radiated into her shoulders, accompanied by tingling in her hands but not weakness (*id*.). The plaintiff had a mildly positive Hoffman's sign bilaterally. Dr. Stovall recommended that she plan to proceed with surgery. On October 27, 2009, the plaintiff underwent an anterior cervical discectomy and fusion at C3-5 to address her right cervical radiculopathy (Tr. 254).

In November, following the surgery, the plaintiff reported she had initially done well but had fallen and hit her right shoulder and had increased neck pain since that fall (Tr. 322). Later that month, the plaintiff reported some numbness under her chin and in her arms (*id*.). In December, she reported some continuing neck pain and right shoulder pain (with occasional numbness and tingling in her fingers). On examination, she showed some sensitivity over her well-healed wound site. Her arms were neurovascularly intact, but she showed some limited ranges of motion and a mildly positive impingement sign. Dr. Stovall considered her condition stable and recommended physical therapy (Tr. 321).

On December 4, 2009, the plaintiff saw Virgil Alfaro, III, M.D., an ophthalmologist at Charleston Retina Consultants. She had blurry vision, floaters, and light sensitivity in both eyes (Tr. 210). Visual testing showed normal vision in both eyes with no evidence of papilledema. Assessment was pituitary adenoma (Tr. 214, 216).

At a follow-up with Dr. Stovall on December 17, 2009, the plaintiff complained of continued posterior neck pain and right shoulder pain with occasional numbness and tingling in her fingers (Tr. 321). Her surgical wound was well-healed, although she did report some sensitivity over the incision, and keloid formation was noted. She had some

limited range of motion in the right shoulder and a mildly positive impingement sign. She was directed to continue to work on her range of motion and to start increasing activities.

On January 12, 2010, the plaintiff was seen at Equilibrium Endocrinology for pituitary issues (Tr. 273). Her blood pressure at rest was 150/100. She was given samples of Synthroid and instructed to get a follow-up MRI in April. Notes from Berkeley Medical Center dated January 14, 2010, indicate that the plaintiff continued to experience neck pain and tingling in the hands as well as pain and tingling in the right leg. Her blood pressure at that visit was 143/104 (Tr. 289). On January 21, 2010, the plaintiff told Dr. Stovall that she had only minimal neck pain and, while she was still having some right shoulder problems, overall numbness in her arms had improved. Dr. Stovall noted that x-rays showed that her cervical fusion was stable, and an April 2009 MRI had showed a mild rotator cuff tear and tendinopathy in the right arm. She was directed to continue advancing her activities in physical therapy for her neck. (Tr. 320).

In February, she was seen by Chad R. Burgoyne, M.D., in connection with her shoulder complaints (Tr.319). She stated that surgery had helped with her neck problems, but she continued to have severe shoulder pain, which limited her ability to fully participate in physical therapy activities (*id*.). She reported difficulty sleeping and doing any activities over her head. She had swelling and weakness in the right hand. The right arm had reduced range of motion and positive impingement and Speed's test. Strength was reduced secondary to pain. X-rays showed some arthrosis and a subacromial spur. Dr. Burgoyne's assessment was right shoulder impingement/bursitis and right shoulder partial rotator cuff tear. He prescribed physical therapy and anti-inflammatories. (Tr. 318-19).

On March 11, 2010, Dr. Burgoyne noted that a MRI report showed mild rotator cuff tendinopathy and minimal partial tearing of the supraspinatus tendon. The plaintiff received an injection (Tr. 317-18). On March 26, 2010, the plaintiff was seen at Berkeley Medical Center and reported that the injection had only helped for a few days (Tr. 292).

8

On April 1, 2010, the plaintiff told Dr. Burgoyne that the right shoulder steroid injection she had received in March had caused some improvement, but had not fully resolved her pain. She was working hard in physical therapy and felt it was beneficial, but thought she was not doing that well (Tr. 317). She could not sleep on her right shoulder due to pain and still had numbness and tingling in her fingers (*id*.). On April 22, 2010, the plaintiff told Dr. Stovall that she had increased her activities over the past three months, but had increased neck pain when raking leaves, sweeping floors, and turning her head significantly. In addition to the shoulder pain, for which she was being seen by Dr. Burgoyne, she was also having some elbow and forearm pain. On examination, she showed fairly good range of motion. X-rays showed a solid fusion at C3-5.

On April 27, 2010, the plaintiff sought care following collapse of a chair in which she was sitting in (Tr. 316.). She reported achy pain in her neck following this accident (Tr. 315). Dr. Stovall felt that this pain was likely due to paraspinal spasms, for which he prescribed muscle relaxants and heat (Tr. 314).

On April 30, 2010, the plaintiff told Dr. Burgoyne that her shoulder had improved, but still bothered her. She said that the pain was not severe and was not interested in pursuing surgical treatment. She said she now had elbow pain, which caused problems with lifting and extension of her wrist. Based on his examination, Dr. Burgoyne diagnosed her elbow problem as epicondylitis. He administered an epidural steroid injection in the right shoulder (Tr. 312-13).

An MRI of the plaintiff's brain on May 19, 2010, showed no significant change in the appearance of her pituitary gland. In addition, cerebral white matter signal changes and small vessel ischemic disease were observed, unchanged from prior exams (Tr. 226). Subsequent MRIs showed minimal nodularity of the left adrenal glad, though it was not clear whether this was abnormal. On June 3, 2010, the plaintiff was started on medication

to address likely primary aldosteronism (overproduction of aldesteroid in the adrenal gland, which can cause hypertension and kidney dysfunction).

On June 7, 2010, James D. Spearman, M.D., noted that the plaintiff still had right shoulder pain. On examination, her left shoulder was normal, but her right shoulder showed crepitance and pain on range of motion testing, with decreased strength but no instability (Tr. 311). MRI findings on June 28, 2010, showed a moderate partial rotator cuff tear of the supraspinatus tendon possibly extending to the long head biceps tendon (Tr. 339). Dr. Spearman recommended arthroscopic evaluation of her shoulder and possible mini open rotator cuff repair (Tr. 309-10). Surgery was canceled because of coughing. A note dated September 14, 2010, indicates that the plaintiff said her shoulder pain had improved, so she wanted to wait on surgery (Tr. 390).

On September 1, 2010, William Cain, M.D., a state agency reviewing physician, concluded that the plaintiff should be able to do light work activities generally, but her ability to use right hand controls was limited; she had to avoid all climbing of ladders and scaffolds; she could reach overhead only occasionally; and she could use her right arm for reaching frequently but not constantly (Tr. 344-51).

On September 23, 2010, the plaintiff was seen at the Moncks Corner Medical Center for complaints of new onset of chest pain. She was diagnosed as having precordial chest pain, acute bacterial bronchitis, pleurisy, and a urinary tract infection (Tr. 376). It was noted that she had recently been hospitalized in Columbia with pancreatitis and elevated liver enzymes.

In October, she was treated on several occasions for abdominal pain and nausea and vomiting, which was thought to be due to acute pancreatitis (Tr. 399-402, 416, 428-29, 451). On October 11, 2010, she presented to Roper St. Francis Medical Center in Moncks Corner with abdominal pain and nausea for two days (Tr. 399-402). The plaintiff also presented to the Franklin C. Fetter Clinic with complaints of nausea and vomiting for

two days (Tr. 451). On October 22, 2010, the plaintiff underwent endcoscopic retrograde cholangiopancreatography ("ERCP") and pancreatic stent placement at Roper St. Francis (Tr. 416). She was admitted two days later after she returned to St. Francis complaining of abdominal pain (Tr. 399-402) Impression was acute pancreatitis status-post ERCP, abdominal pain, and vomiting. She was placed on pancreatic rest, IV fluids, pain control and nausea control. The plaintiff was discharged on October 27, 2010, and, at that time, she was feeling good with the nausea, vomiting, and admominal pain resolved. She was to return to MUSC in a few weeks for ERCP and a biliary sphincterotomy (widening of the pancreatic sphincters) (Tr. 428-29).

An MRI of the plaintiff's thoracic spine on October 13, 2010 showed disc protrusion at T8- 9, with stenosis and mild to moderate deformity but no abnormal cord signal. There was also some disc bulging and osteophyte formation at T6-7, without spinal canal stenosis (Tr. 392-93).

On November 19, 2010, the plaintiff was seen at the Medical University of South Carolina ("MUSC") for intermittent abdominal pain (Tr. 436). She underwent ERCP, biliary sphincterectomy, and a stent change (Tr. 437-38). Impression was sphincter of Oddi dysfunction and elevated pancreatic enzymes.

On January 6, 2011, the plaintiff's updated medical records were reviewed by Joseph Gonzalez, M.D., who concluded that the plaintiff could generally do light work activities, but was limited to occasional overhead reaching with his right arm and needed to avoid climbing ladders and scaffolds (Tr. 455-61).

On February 18, 2011, J. David Bohler, M.D., noted that the plaintiff reported recurrence of upper right quadrant pain, now accompanied by nausea (Tr. 465). On March 2, 2011, the plaintiff complained of right shoulder pain at a routine health visit (Tr. 474). Neurontin was not helping. Pain was 8.5/10. She had an orthopedic referral but was unable to keep the appointment as she had no money for an MRI. She had decreased

11

movement in the right shoulder. She was given a Toradol injection and prescribed Ultram. She was to investigate patient assistance programs at local hospitals for care options.

On March 23, 2011, Dr. Bohler noted that liver, thyroid, and kidney function tests were now normal (Tr. 464). At this time, the plaintiff reported continuous severe right upper quadrant pain, with no exacerbation after eating. Dr. Bohler did not think this complaint was related to Sphincter of Oddi dysfunction, but rather that it could have a musculoskeletal origin (*id.*). She was prescribed Motrin, Elavil, amd omeprazole. On April 15, 2011, Dr. Bohler noted that the plaintiff had not had improvement of her pain complaints and now was having some post-meal nausea and diarrhea. He thought that possibly her complaints could be due to scarring of the previous sphincterectomy. Repeat ERCP was suggested, and she was given Elavil, metoclopramide, and Welchol. If the medication resolved her pain, the ERCP would be cancelled or postponed (Tr. 463).

The plaintiff continued to seek care at the Franklin C. Fetter Clinic for pain in her back and shoulder from July through December 2011 (Tr. 477-484). She needed a orthopedic exam, but stated she could not afford it. Assessment during this time included osteoarthritis, degenerative joint disease, degenerative disc disease, and Hepatitis C. On August 23, 2011, a treating source at the clinic indicated that the plaintiff had a right rotator cuff tear along with MRI findings consistent with thoracic and lumbar spine degeneration. It was recommended that she not lift over ten pounds (Tr. 478).

On November 30, 2011, the plaintiff was seen by Peter White, M.D., at MUSC for left forearm and wrist pain, with mild tingling and numbness on waking, which got better with use during the day, and questions about her right shoulder (Tr. 495). After an examination, Dr. White advised her that she had minimal limitations in function and range of motion in her right shoulder, so an operation would not likely improve her condition. As to her recent left arm problems, this could be due to cervical spine pathology (Tr. 496).

***Plaintiff's Reports and Administrative Hearing Testimony***

In October 2010, the plaintiff reported that her neck and shoulder pain had worsened, and she was having headaches and sleeping problems (Tr. 173). In March 2011, she reported that her condition had gotten worse. She had trouble with activities like washing her hair and scratching her back. She had trouble sleeping on some nights due to shoulder pain. Bending down, walking and standing, and turning her neck caused pain. Doing house chores (sweeping, mopping, washing dishes, folding clothes) took longer than normal. She needed additional medical care, but had no insurance. Sitting, standing, bending, and walking all caused pain (Tr. 185).

At the hearing, the plaintiff identified pain as her primary barrier to working (Tr. 30). Her pain was chronic and interrupted her sleep. She did not wake up feeling refreshed. She woke up and took a hot shower or bath to get moving and took her medications. The plaintiff had gone back to school in 2006 to pursue her lifelong dream of teaching, but when she graduated and started working, she was hampered by her impairments (Tr. 31). She became extremely fatigued, suffered from intense headaches, and neck and shoulder pain. "Sometimes the shoulder pains and the neck pains, I don't know which one it is, because it just hurts so bad." She could barely finish household chores and relied on her husband (Tr. 32). She wanted to go back to teaching but did not feel that she could.

The plaintiff had a problem with her right rotator cuff. She was scheduled for surgery, but it had to be postponed due to an illness. Then her insurance expired, and she could not afford the procedure. She had been sent to physical therapy, but could not afford to go. The plaintiff had also had surgery on her neck, but felt that it had not been successful. She described a limited range of motion and some pain in her neck (Tr. 33). She especially had trouble reaching over her shoulders to put on clothes.

In addition to her shoulder impairment, the plaintiff had begun to experience mid and low back pain within the past year (Tr. 34). An MRI had shown "discs bulging" and osteoporosis. She also had problems with stomach pains, nausea, and diarrhea. She had undergone a biliary sphincterotomy in 2010, a liver biopsy in 2005 or 2006, which had left scarring, suffered from Hepatitis C, and had a pituitary tumor (Tr. 35-36). She had started treatment for Hepatitis, but it made her sick and she stopped. Her doctors were watching her tumor.

In terms of her daily functioning, the plaintiff testified that she could clean for a few minutes, then needed to sit (Tr. 37). She could put clothes into the washer, but could not take them out when they were wet. Her husband did their grocery shopping and cooking. She cooked a meal maybe twice a week. Her only social activity was going to church (Tr. 38). Besides that, she was "at home, either sitting on my chair or sitting on my porch. Just being depressed."

The plaintiff took Flexeril, Tylenol with codeine, and Naproxyn for her pain. These helped sometimes unless the pain was very severe. Sometimes the pain was so bad that she went to the doctor for "a shot." This happened about every two months. The medications made her even more tired and drowsy. She closed her eyes to rest throughout the day, but had trouble sleeping (Tr. 39).

The plaintiff suffered from pain in her hands and arm, which made typing for more than five or ten minutes painful. She could not sit for a long period of time. When she was substitute teaching, she had to stand up and walk around every few minutes. She explained that the substitute teaching job required her to "constantly move around" and that she was unable to "keep up" with the students.

*Vocational Evidence*

During the administrative hearing, the ALJ asked the vocational expert to assume a hypothetical worker who could do light work that did not involve climbing ladders

14

or scaffolds, more than occasional reaching overhead, more than occasional pushing and pulling with the right arm, or more than occasional lifting and carrying of more than ten pounds (Tr. 41-42). The vocational expert testified that such a worker could perform the light, unskilled occupations of storage facility clerk, ticket taker, and coupon recycler (Tr. 42).

## ANALYSIS

The plaintiff was 49 years old on the alleged disability onset date (June 4, 2009), and she was 53 years old on her date last insured (December 31, 2013). She received an Associate's Degree in early childhood education in 2008 (Tr. 28, 183). She has past relevant work as a cashier and cafeteria attendant (Tr. 20, 41). The plaintiff argues that the ALJ erred by (1) failing to find that her sphincter of Oddi dysfunction was a severe impairment; (2) failing to assess the combined effects of her multiple impairments; (3) failing to properly assess her credibility; and (4) failing to conduct a proper residual functional capacity ("RFC") analysis.

The plaintiff first argues that the ALJ erred by failing to find that her sphincter of Oddi dysfunction is a severe impairment. At step two of the sequential evaluation process, the ALJ found that the plaintiff had the following severe impairments: right rotator cuff tear/tendonitis, status post cervical anterior cervical diskectomy and fusion ("ACDF"), and a thoracic deformity (Tr. 13). The ALJ considered the plaintiff's sphincter of Oddi dysfunction and found that it was not a severe impairment (Tr. 14-15). Specifically, the ALJ noted that the plaintiff began having issues with abdominal pain and nausea in October 2010, she underwent ERCP, and she was later hospitalized for three days for abdominal pain and vomiting (*id.*; *see* Tr. 399-402, 416, 428-29; 451). She underwent another ERCP in November, after which she reported improvement in pain for two to three weeks (Tr. 14-15; *see* Tr. 437-38, 474). Her pain and nausea recurred, but in March 2011, her liver function, thyroid, and kidney function tests were largely normal (Tr. 464). Dr. Bohler, the

15

plaintiff's treating gastroenterologist, noted that the plaintiff's right upper quadrant pain seemed not to be related to her sphincter of Oddi dysfunction but rather might be musculoskeletal (Tr. 464).  In April 2011, Dr. Bohler recommended that the plaintiff should be scheduled for a repeat ERCP, and he noted that if the medication resolved the plaintiff's pain, the ERCP would be cancelled or postponed (Tr. 15; *see* Tr. 463).  The ALJ further noted that while the plaintiff testified to some nausea, her testimony and allegations in disability reports failed to describe any functional limitations associated with her nausea (Tr. 15).  The ALJ concluded:  "As the evidence or record reveals that the [plaintiff's] sphincter of Oddi dysfunction status post sphincterectomy has had no more than a minimal effect on her ability to perform basic work activities, it is therefore considered a nonsevere impairment" (Tr. 15).

The plaintiff argues that the ALJ's rejection of her sphincter of Oddi dysfunction as a severe impairment does not make sense because "[n]ausea seems as though it would be a functional limitation itself" (pl. brief at 12).  The Commissioner argues that the plaintiff "did not clearly show that such condition persisted at the requisite level of severity for at least twelve continuous months" (def. brief at 10).  However, as argued by the plaintiff, this is *post-hoc* rationalization not included in the decision (pl. reply at 1).  *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir.2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").  Moreover, the record shows that the plaintiff first complained of severe abdominal pain on September 24, 2010 (Tr. 389).  As set forth above, she was treated for abdominal pain and nausea in October and November 2010 as well as in March, April, May, and August 2011.  In a March 2011 function report, the plaintiff stated, "I still have complications from pancreatitis stint – get nauseated from smelling food, perfume, cleansers and at times I can't keep my food down"

(Tr. 186). At the hearing in January 2012, the plaintiff testified that her nausea and stomach pain were still issues and that different smells set off her nausea (Tr. 35).

If an ALJ commits error at step two, it is rendered harmless if "the ALJ considers all impairments, whether severe or not, at later steps." *Robinson v. Colvin*, No. 4:13-cv-823-DCN, 2014 WL 4954709, at *14 (D.S.C. Sept. 29, 2014) (citing *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008)). In the RFC analysis, the ALJ recognized the plaintiff's complaints of abdominal pain and nausea, noting that she suffered "nausea from smelling food, perfume, or cleansers and at times she could not keep her food down," she "has nausea that is usually triggered by smells such as coffee, perfume, or air freshener [and] eating or even drinking water can cause nausea," and "[s]he also has pain in her side" (Tr. 17-18). However, the ALJ did not consider the plaintiff's abdominal pain and nausea in formulating the RFC and did not state her reasons for not including non-exertional functional limitations related to the plaintiff's pain and nausea (*see* Tr. 17-20). Accordingly, the ALJ's error cannot be considered harmless.

Based upon the foregoing, the undersigned recommends that the case be remanded for further consideration of the plaintiff's sphincter of Oddi dysfunction and resulting abdominal pain and nausea at step two and the following steps of the sequential evaluation process. In light of the court's recommendation that this matter be remanded for further consideration, the court need not address the plaintiff's remaining issues, as they may be rendered moot on remand. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir.2003) (remanding on other grounds and declining to address claimant's additional arguments). However, upon remand, the ALJ should be instructed to take into consideration the remaining allegations of error including that the ALJ failed to consider the combined effect of the plaintiff's multiple impairments and failed to properly assess the plaintiff's credibility (pl. brief at 13-19).

17

## **CONCLUSION AND RECOMMENDATION**

Now, therefore, based on the foregoing, this court recommends that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

November 7, 2014
Greenville, South Carolina